THREE-DIMENSIONAL MEDIA GROUP 2011-06-05 Good morning, we are Police Record. South Australia. We are from Australia captured in New York appearing on behalf of the Pellants Three-Dimensional Media Group. This is a patent case with a lot of detail in it, but it really, most of the issues boil down to very straightforward claims and structures and conditions. And in our view, when construed correctly, the claims clearly distinguish over all prior art record the two primary terms that appear to be in dispute are the phrase three-dimensional image and image element. And in our view, the phrase three-dimensional image should have its ordinary meaning. There is ample evidence in the record of what that is, starting with a dictionary definition tied to an encyclopedia definition from the Carter Encyclopedia and two expert declarations by Professor Spiner and Dr. Chow. And all of that is consistent 100% with how the patent is using that terminology and what it means. A three-dimensional image is... I think that this argument applies to some of the claims, right? We have to reach the image element issue under all circumstances, right? Because, for example, claim two wouldn't be invalidated by anticipation of fault in that. Okay. Just to be clear, if I understand this question, the phrase three-dimensional image does appear in all the claims. Yeah, but claim two, for example, talks about the limits of the left-right image. So even if the patent office were correct about the use of a three-dimensional image, that doesn't solve the problem in claim two. We've still got to get to the image element issue, right? I agree that, yes, the court does need to address what an image element is. We'll get to it in a moment. I just want to clarify something about claim two. There's some misinterpretation by the PTO from the beginning, carrying all the way through to the director's brief, about what claim two says. What claim two says is that the method results in the generation of a left and right pair of processed image frames. Not just a left and right pair of image frames, but that they're both processed. Perhaps the best way to understand all of these issues, including claim two issues, is to look at figure one of the patent defense. I brought extra copies in case the court needs me. So why does the image element include pixel-by-pixel processing? In Cooperman and South, they use exactly the same term, in the gel. In the Peter South department, they use that to describe pixel-by-pixel processing. So why in this patent shouldn't we view image element as broadly incorporating not only the same images as you are, but also pixel-by-pixel processing? The term image element has no ordinary meaning. It is not a term of art. It was used in the prior art to refer to a pixel-by-pixel process, right? So, yes, the phrase was used for that purpose. But the way the law works is that a term that has no ordinary meaning, it is not a term of art, which was established by our experts in the declarations, is interpreted in view of the specifications. So it is quite possible that when we use the term image element in our patent, we have a certain meaning. We've always said that we've looked at prior art patents to determine the meaning of the term. But it does not have a single meaning. There's no single term of art. There's no ordinary meaning to that phrase. When used in our patent, it is 100%— We certainly agree that it could be broad enough to incorporate pixel-by-pixel processing, right? Not just used in our patent. At least it's in the abstract, right? Certainly. Is standing alone that term to include pixel-by-pixel processing? Honestly, I don't know. As far as the evidence— You don't know? Well, the reason I say that is that the evidence in the record indicates it's not a term of art. So I don't know what it means, standing alone. It needs context. Well, it's used in Cooperman to refer to pixel-by-pixel, right? In the context of Cooperman, if I'm reading Cooperman, given that he's basically taking the density, the illumination intensity of a pixel and assigning a depth value, and that he says that's an image element, I guess I'd understand what he means because I'm reading in the context of that patent. In the context of our patent, that is clearly not what it means. What if the term is being used is to describe a coherent object that's physically meaningful to most people? Well, in the preferred environment, yeah. But in the earlier description of the invention, it talks about computer processing. These images, why couldn't that include pixel-by-pixel processing? It's not just the preferred environment. With respect, it's the entire specification, and it's describing and referencing the term image element consistently is describing something that is physically meaningful to a user. If we start with Figure 1, for example, it's a square and a circle. These are image elements that are physically meaningful to a user. The other examples, and only other examples, are like the nose on someone's face. It might pop out in stereoscopic in a 3D movie, or a cartoon character that might have popped out in Toy Story 3 or something like that. Then in columns 3 and 4, there's a description of these image elements as having properties. They have, for example, an outline. An outline that a human being, a human operator, would identify. If we draw a description of the preferred environment, where in the other part of the specification does it indicate that image processing is used in a way that is limited to that? You said image processing. Excuse me, image elements? Image elements. This is the only, these are the only embodiments that are being described here. The question was whether it was limited to the self-embodiments that are described. No, I would not catch the legal issue there. The legal issue is that it has no ordinary meaning. So, this court has ruled repeatedly, the Honeywell case and other cases, that in that type of scenario, when there's no ordinary meaning, the specification is the best context in which to understand what something means. And in the entire specification, from the beginning to the end, the context of what an image element is is only a coherent object that a human being would recognize. Meaningful to a human being. There is nothing in this specification that indicates otherwise. It is consistently assumed that that's what it is. As I indicated, it has characteristics and properties, like it has an outline that a human being would identify. That's in column four, lines 23 to 27. And later on in column four, it talks about the values of that element. But the problem is, in that respect, you're talking about someone implementing this process using the styles. And to be sure, if someone were to implement it using the styles, it might be quite difficult to do it. I'm guessing it might be something that's improbably impractical. But if you're talking about a conservative, which needs to be covered by the convention, then you can do it on a piece of paper, right? Computers operate on digital binary data. So at some level, yes, but that's not how the term is being used. The way the term is used, even in a situation where a human being would not use the styles, is talking about predefined objects, like you would have in a video game or in a cartoon, where someone has already predefined an object. It's still a coherent object that would be visibly meaningful to a user. There's no description of any specification that claims to require specifying this image element and separating it and processing it as an image element. There's nothing in this description that would indicate that a single pixel could ever read that or that it would ever produce a three-dimensional image in any way. So, we will have a very quick look at what we should avoid. We should try to provide context to the two primary terms at issue. So, should I take that question? So, if you look at figure one, it provides context as to really, and there's only two figures, the other one is just a system diagram of the computer system. So, this is what this convention is about. It is about taking a real-world image, identified as the rule of ten, where objects appear at stereoscopic depth. So, if the court is looking at me making this argument, the podium is in front of me, I'm behind the podium, counsel's table behind, and so forth. So, you see depth with your eyes, you have two eyes, and you're seeing two different images with your eyes. That's the concept of stereoscopic depth. That's what's shown by ten, that's the real world. Ultimately, what we're trying to get to is that the user sees that, again, all the way on the bottom at 80. And what happens is that when someone takes a photograph, if the court had a camera and took a still or a video of me right now, it would look like what's in 20. If all the stereoscopic depth would go away, it would be a flat, two-dimensional image. So, the question is, how do you get that back? So, according to our invention, you identify the image elements. Again, these are image elements that you would want to recreate the stereoscopic depth. Things have to pop out. The podium should pop out in front of me, and I should pop out in front of the tables, and so forth. There'd be nothing accomplished by having one pixel of this podium pop out. It's a meaningless image. It would be arbitrary to pick a portion of the podium, and the floor, and the background, just so it happens to be in a two-dimensional image. That's not an element, but the image. That's just an arbitrary selection. If it's done by first specifying an image element, then it would be. So, the claim requires, I'm just taking claim one, requires specifying at least two individual image elements. So, these image elements have to be specified. Ultimately, then the computer is going to do processing later on in claim step E, this processing of that. Now, within the computer, it takes that representation of a coherent object, and it represents it as pixels. The computer-written description makes no effort to actually define what you mean by image element. We're not professing that you are a homo-psychographer. That's what's suggested. We're not taking that position. We're just taking the position that it is not a term that has an ordinary meaning, and therefore, you have to go to the specification. The specification does, I wouldn't call it a definition. That would probably be all invented. But it consistently describes it as having certain properties. It has a size. It can become 5 minus 30 to 35. Post-apocalyptic image element having certain size. It has parts. It has an outline. It has a boundary. It has all these characteristics and properties which pixels don't have. And if we were talking about a pixel, there'd be no need to specify them. All the computer's images already have pre-specified, the pixels are already pre-specified. So there'd be no meaning to that step of the claim of specifying a pixel or an image element if it's just a pixel. So our position is that the specification consistently uses the term image element to indicate that it is something that has all these characteristics of a hearing object, and that ultimately, by adding depth information to it, you create this three-dimensional image where things are popping up. Sir, I was wondering if you wanted to say some more about it. I did, yes, so I'll go ahead and do it. I can't see it because of the background. Thank you very much. Most of the argument you heard here from the comment was all about the term image element. I'd just like to point out that the dispute over the term image element really only relates to the Cooperman-based projections. All the other projections, image element, it's not an issue. Furthermore, let's just say we agree that we sort of let it down there so we can't move on to the other. In order to sustain the projection of all of these claims, we either have to rely on Cooperman or Hiram and others internationally. Right, or you also have the projections of Falk and Olka. Applies to a very large percentage of them, but not all of them. You're right, not all. You're right, Hiram would be an alternative basis to reject the claims. Falk and Olka apply to many of the other claims. In fact, the independent claim number one, which the big fight in even claim two, Falk and Olka applying to those. But not in claim two, because claim two, as you pointed out, has left and right reciting. Claim one doesn't talk about left and right. But just to get back to image element for a second, even if they were correct, that image element would not encompass a select pixel approach. The board and the examiner made specific findings that nevertheless Cooperman still discloses groups of pixels where a whole component, like the edge of a house, for example, was being transformed from 2D to 3D. So even if you took their construction which the board and the agency don't believe is the correct construction, nevertheless, even if we were wrong, we still think that that projection is sustainable based on the fact that the findings are correct. Help me understand, and I'm going to slow up some of this, exactly what is it that the board in dealing with the claim construction issue and the question of what is three-dimensional. I'm not quite clear on what their, first of all, what they believe their standard is and how it works. It's obviously not the broadest possible, which is what you presumably use when you're first doing an evaluation, but in this case, it wouldn't inspire that. So they said, no, we don't use that when we're going to do something presumably narrower. But I'm not clear on what presumably narrower means, because you may remember, you might not have any reason to remember, but I wrote in a comparing opinion while they were pointing out that claims ought not to be allowed to be any broader than the invention described in the patent. Others have said a similar thing. And it wasn't clear to me whether the board's standard for claim construction allowed something broader than what was invented because that sort of was somewhere closer to what they otherwise would use, or... Could you help me? I'll try to explain it. I think I know what they did, and I'll try to explain it. We tried to point this out briefly. What happens here is in a unique situation where a patent is expired during the agency. It can't be amended. And because of that, the agency, not because of any court, this court or any other court telling us to, but the agency voluntarily on its own came out with a policy that said, look, in that case, when you can't amend it, we're not going to track the typical broad construction standard. What we're going to do is we're going to try to construe the claim a little more closely the way a district court does. We're going to try to follow court construction rather than broad street construction. However, when you do that, when you fall into that category of what they would call court construction or following the Phillips, I guess, standards of construction, you still have to apply the ordinary tools of claim construction. For example, looking at the express language of claims, looking at how the claims relate to each other, looking at the specification, how it is read in context and spec, looking to see whether or not the applicant or the appellant here acted as their own lexicographer. And they did all of that. The board went through all of that. That's what they tried to do. Yet, it's a more lenient standard than what is applied to the broad street construction standard. So basically, lenient in the sense that they're basically giving a little bit more in the construction side of the house towards the applicant rather than the typical broad street construction. But keep in mind, even if that is narrower than the broad street, not in every instance, only when there's really an ambiguity would there potentially be a narrow construction. For example, in Phillips, it says we go through the normal tools of claim construction and after we've done all of that, only if there's an ambiguity will we lean towards preserving the validity of the claim. That's what it says in Phillips. But if you go through the ordinary steps of claim construction and you understand the construction, you don't get to that point. So that's a limited... Phillips called that a limited maximum. So back here, the board did those exact things. They said, hey, let's look at the claim. We see in claim one this term three-dimensional, three-dimensional damage. And we've asked the appellant, how did the board end up defining three-dimensional damage? And the way they defined it was, yes, it's broader than what they've argued, but it's not unlimited. They've said three-dimensional can mean the typical three-dimensional, as the appellant has argued, a left and a right image stereoscopic, two images that you view together that helps you have an illusion of depth. Or alternatively, as the specification explains, there can be other techniques to impart an illusion of 3D, other techniques like shading, skewing, blurring, and a computer graphics in performance. So the board said, hey, your own spec contemplates more than just left and right stereoscopic images to determine what three-dimensional means, what three-dimensional means. Therefore, we're construing your claim term consistent with your specification, and since you haven't pointed out any lexicography disclaiming or disavowing any other scope, we're going to go with that construction. That's what the board did. Now, upon this, your argument is that where the board ended up on a claim construction was within the parameters of the claim invention as described in the written description. Which means it would be consistent with the decision of your argument that we were talking about earlier. It would be consistent with that. The board did not go beyond what the written description defined these claim terms to mean. Three-dimensional was an ordinary term. There was no specialized definition, and the specification talked about the examples where you could impart illusions of three dimensions into a typical 2D picture or frame, and you could do that in other ways besides stereoscopic parity. Now, we don't dispute that, yes, left and right imagery, having two images, that's a very common way of doing it. The spec talks about that common way, but the spec goes further and talks about these other techniques as well. Furthermore, Appellant mentioned the Encarta reference, and he said, hey, Encarta defines what three-dimensional is, and if you look in the record you cited for the Encarta reference, it talks about it absolutely. We have left and right images. It's very common in the past. For instance, in the 1940s and 1950s, the idea of having two images that you could look at separately to give you the illusion of depth, that's common. But they also talk about other techniques to create three-dimensional illusions. For example, computer techniques where they include shading, skewing, blurring, etc., these other ways. But their argument seems to be that they invented something that has this basic pop-up character, pop-out character, to these other technologies in that world that you described. All that pop-out really gets to is you fool the viewer into seeing what they think is 3D. Remember, there is no such thing as an actual three-dimensional item here. Everything is in two dimensions. We look at it, and we're fooled into thinking it has depth, right, or it looks like depth. So, as far as popping out of a page goes, that's also true of the video. That's a rough idea. But my point is that popping out of a page is the way a viewer would perceive the image. And yes, if you perceive a picture that was in a computer where these other enhancement techniques to give depth, and it fools you into seeing that, you would think that pop-out of a page as well. For example, their own spec says there's other techniques, one of the other techniques, they talk about a laser blast. I think we cite it in our brief. And the laser blast can fool you into the illusion of thinking something is coming forward in the viewer's face. That's an example where there's not left and right images, yet you've been fooled into thinking that. So, all I think the board did was they construed the term three-dimensional to include things beyond left and right images. To further support that, they construed it in a sort of negative way. They never really said, here's what three-dimensional images mean. Yeah, let's see what they... The board actually kind of addressed that because, as Appellant pointed out, there was a dissent in APJ in this board decision, and the dissent in APJ made a similar criticism. But the majority of APJs responded to that. I think it's page A81 of the board decision or A81 of the appendix. I don't know if you have that in front of you. And I think they do talk about their construction or the way they define the term three-dimensional. And if you go down where it says response to the dissenting opinion, you see that. Further down in there, it says the definition carefully circumscribed based on claim construction precedent and the arguments and evidence of record is not so raw. So raw is what the dissenting opinion would say. It links three-dimensional images to those produced by known two-dimensional to three-dimensional frame conversion techniques. The majority polling reveals that such known techniques, including computer-implemented stereoscopic techniques and mathematical-type transformation techniques involving curved or textural surfaces, each of which produces a depth effect, which skilled artisans describe as three-dimensional. Now, what were they talking about there? Precisely what's in effect. Right. So your point is, they don't come right out and say... Yeah. Well, what the examiners of the board did here was they say, looked at the prior art, they looked at the claim, they construed the claim, and they said, does the claim capture the prior art? They said, yes, it does. Appellant came back and said, no, it doesn't. And they addressed those arguments. And I think you're correct, Your Honor. They didn't go around the complete perimeter of the claim and construe every single piece of real estate defined by that claim. What they did do is they construed the claim in the context of the prior art, and they construed the claim in the context of the arguments made by the appellant. Now, I think there's a recent case, anybody know it? It talks about... It has anything to do with Cooperman. Right? Because... Absolutely. I'm confused by the dissent, which seems to say, oh, well, because I disagree with the definition of 3-D image, I overturn the objections, but it doesn't... Well, the dissent doesn't really address... And I don't think he's overturned... I don't think the dissent meant that he was overturning the Haromei and Cooperman objections. He was only overturning the rejections related to Falkenoga, which means all of the rejections are still on the table, even if you agree with the dissent of the APJ. And, of course, I'm here to defend the majority board decision. I believe that if you read that specification and you read that plain three-dimensional image in the context of their own spec, that their construction was correct and it is affirmable. But even if you were to agree that that construction was wrong, all that does, it gets rid of the Falkenoga rejections, but you still have all the other rejections based on Cooperman, Haromei, and then there's a numerous... Obviously, it's actually as well as some other secondary references. So, that really doesn't get them there by winning that yet. We do stand behind the construction of the three-dimensional image. I hope that... I tried to answer your question. I hope that's helpful to you. In the name of the case, you might be interested in the use of retractable... Excuse me, Your Honor? Retractable. Correct. I am interested in that, but I'm going to let you down. I appreciate it. And, you know, and finally, I'd just like to point out that, you know, appellant has put in their brief that we've somehow confused their argument that they made about the term three-dimensional, that three-dimensional, oh, no, no, no, it doesn't just mean left and right, because in my brief, in our brief, we put down claim two, as Judge Wright pointed out, says left and right, and that's like a further limiter of independent claim one. So, one of our comments was, under the doctrine of claim differentiation, that claim two talks about left and right. Claim one necessarily means something broader than that, which legally encompasses the construction of the board in a year and it encompasses the priority of the site. So, I think that's, that's our primary argument of the case, and I have nothing further unless you have more questions. Thank you. Thank you very much. Have a good time. Let me begin by addressing what PTO has admitted is their primary argument. It's just a case of, with due respect, it's just not being heard. So, if you look at claim two, claim two is left and right as a process. The word process is left out in their brief when they quote the claim. If you go back to figure one, just for the purposes of explanation, you see that what's known to frame 20 is to create two process frames, 40 to 30. In each one, one of the image elements has been moved. Okay? So, in claim, in figure 30, I'm sorry, reference number 30, the square is moved, and one of them, the circle is moved, one of the squares is moved. It's tough to look at. Then, there's two choices at that point. See, there's a dotted line going from 20 to 50. You could take the original frame, 20, and combine it with either one of those. If you did, what you would have is that one of the two shapes would pop out, not both, one. As far as claim one is concerned, that would be claim one. But claim two is saying that if you take both processes, process frames, and you combine them, that is something called binocular 3D, which is that you're really getting, you know, like multiple things popping out. So, claim two is talking about taking both process ones. You don't have to do that to get stereoscopic vision. You can take the original frame and one process one. And PTO has been making that argument and it's just tricky to explain it and don't seem to be able to get through. I want to also quickly address, if I may, PTO has said that the word image element only affects Kuberman. That's not correct. Hiromi also does not show specified image element. Hiromi is talking about, to the extent we understand it, scenes, taking a whole swath of the screen and moving it and then coloring it differently so that it looks 3D. It would be as if, again, we took the photograph and this whole scene, including the podium and all these things behind it, nothing would pop out just like the image would look, it wouldn't look like what we call 3D. There's no coherent object being specified. The claim requires specifying a coherent object. No, no. We all, when we go to the movies and see 3D movies, we expect things to pop out of the screen. We don't expect whole portions of the screen to just pop out of us. That's not what we would consider that we paid $54 for. I see my time has expired so let's go to the questions. Thank you.